UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

ALEJANDRO JIMINEZ,

       Plaintiff,

  -v-                                               No. 17 CV 2844-LTS-JLC

CREDIT ONE BANK, N.A., NCO
FINANCIAL SYSTEMS, INC., and
ALORICA, INC.,

       Defendants.

-------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER

Plaintiff Alejandro Jiminez brings this action against Credit One Bank, N.A. ("Credit One"), NCO Financial Systems, Inc. ("NCO"), and Alorica, Inc. ("Alorica," and together with Credit One and NCO, "Defendants"), for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. Plaintiff now moves, pursuant to Federal Rule of Civil Procedure 56, for summary judgment. (Docket entry no. 49.) Credit One also moves for summary judgment dismissing Plaintiff's TCPA claim or, in the alternative, to stay the proceedings pending a ruling by the Federal Communications Commission (the "FCC") on the treatment of reassigned phone numbers. (Docket entry nos. 68, 74.) NCO and Alorica join Credit One's opposition to Plaintiff's motion for summary judgment, as well as Credit One's motions for summary judgment and for a stay. (Docket entry nos. 53, 57, 66, 83, 85.) The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331. The Court has carefully considered the parties' submissions in connection with the instant motion practice and, for the following reasons, Plaintiff's motion for summary judgment is granted, and Credit One's motions for summary judgment and a stay are denied.

BACKGROUND

Unless otherwise indicated, the following facts are undisputed.[1]  Defendant Credit One Bank is a national banking association.  (Docket entry no. 30, Credit One Answer ¶ 6.)  On or around September 15, 2016, an individual applied for and obtained a credit card account with Credit One.  (Docket entry no. 73, Def. 56.1 St. ¶ 1.)  As part of the application process for the account, the individual provided her personal information to Credit One, including a telephone number ending in 7929 (the "Subject Number").  (Def. 56.1 St. ¶ 2.)  Credit One approved the individual for the account and subsequently mailed her a credit card along with Credit One's standard cardholder agreement.  (Def. 56.1 St. ¶ 3.)  The individual accepted the terms of Credit One's standard cardholder agreement, including a provision authorizing Credit One to contact her at the telephone number she provided, when she used the card.  (Def. 56.1 St. ¶ 4, 5.)  Some time thereafter, the individual defaulted on her credit card account and Credit One attempted to call her to collect an unpaid balance.  (Def. 56.1 St. ¶ 6.)

Credit One authorized Expert Global Solutions Financial Care ("EGS") to collect the unpaid balance.[2]  (Def. 56.1 St. ¶ 8.)  Between January 2017 and March 27, 2017, EGS placed 380 calls to the Subject Number.[3]  (Pl. 56.1 St. ¶ 10.)  The parties agree that EGS did not

---

[1] Facts characterized as undisputed are identified as such in the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there has been no contrary, non-conclusory factual proffer.  Citations to the parties' respective Local Civil Rule 56.1 Statements ("Def. 56.1 St." or "Pl. 56.1 St.") incorporate by reference the parties' citations to underlying evidentiary submissions.

[2] Defendant NCO became EGS in 2015, and EGS was acquired by Defendant Alorica on June 30, 2016.  (Def. 56.1 St. ¶ 8, n.2.)

[3] The parties dispute the number of calls that were received by Plaintiff and the number of calls that successfully connected to a live party.  Credit One argues that, because 43 calls were identified as "Invalid Phone Number" on EGS's call log, and only one call was identified as "AGENT – CUST 28," 43 of the calls were not received by Plaintiff and only one call successfully connected to a live party.  Plaintiff disputes the assertion that only one outbound call attempt successfully connected to a live party, testifying that, on multiple occasions he answered the Subject Number but did not hear anyone else on the

transmit any prerecorded messages to the Subject Number. (Def. 56.1 St. ¶ 15.) During the time when the calls regarding the delinquent Credit One account were made, Plaintiff was the holder of a cell phone account connected to the Subject Number. (Pl. 56.1 St. ¶ 2; Def. 56.1 ¶ 13.) It is undisputed that Plaintiff has never had any relationship with Credit One. (Pl. 56.1 St. ¶ 9.)

The calls placed by EGS to the Subject Number were all made through the LiveVox 3.2 dialing system using its Quick Connect feature. (Pl. 56.1 St. ¶ 12; Def. 56.1 St. ¶ 19.) To use the LiveVox system, an EGS manager uploads a list of telephone numbers provided by Credit One into the system each morning. (Pl. 56.1 St. ¶ 16; Def. 56.1 St. ¶ 18.) Those phone numbers are stored in the LiveVox system throughout the workday. (Pl. 56.1 St. ¶ 17.) When using Quick Connect, the dialing system uses a proprietary algorithm created by LiveVox to determine how many calls to place automatically in order to keep customer service representatives fully occupied at all times. (Pl. 56.1 St. ¶ 18.) As more customer service representatives log into the dialing system and indicate their readiness to take calls, the dialing system will increase the number of calls it automatically makes. (Pl. 56.1 St. ¶ 19.) When Quick Connect places calls, it will place more outbound calls than the number of customer service representatives actually logged in and ready to receive calls, based on the assumption that not all of the people being called will actually answer their phones. (Pl. 56.1 St. ¶ 20.) There are no customer service representatives on the phone when a call is launched by Quick Connect. (Pl. 56.1 St. ¶ 22.) Instead, Quick Connect will transfer only those calls that are answered by a customer to an available customer service representative. (Pl. 56.1 St. ¶ 23.) If there are more answered calls than available customer service representatives, answered calls are transferred to

---

line. (Docket entry no. 51-1, Jiminez Dep. 52:19-53:19; 65:3-66:3; 77:6-23; 84:23-86:19.) The parties agree that EGS stopped calling the Subject Number on March 27, 2017. (Def. 56.1 St. ¶ 14.)

a holding queue until a representative becomes available.  (Pl. 56.1 St. ¶ 24.)  A customer service representative using Quick Connect does not have the ability to manually dial a phone number or to select a specific account to call, nor does the representative have any input into what number Quick Connect will call next.  (Pl. 56.1 St. ¶¶ 26, 27.)

The parties dispute whether the LiveVox system used to call Plaintiff is properly classified as a "predictive dialing system" within the meaning of certain FCC rulings, whether the system requires human intervention to launch each call, and whether the system has the capacity to store or produce randomly or sequentially generated telephone numbers.  Relying on testimony from EGS's Corporate Designee, Andrew Balthaser, and the expert report of Ray Horak, Credit One argues that LiveVox is not a predictive dialing system.  Balthaser testified that Quick Connect does not operate as a predictive dialer because "to my knowledge, the algorithm is not changing.  It's not adapting or predicting different things.  It's operating within guardrails that are established at the creation of a campaign."  (Docket entry no. 70-1, Balthaser Dep. 51:9-19.)  When asked if he knew whether the LiveVox Quick Connect "algorithm or system has any predictive capabilities," Balthaser stated that "only LiveVox has access to their algorithms to see how it paces or controls the number of calls launched."  (Docket entry no. 81-1, Balthaser Dep. 100:16-101:8.)

Relying on an interview with Balthaser, Horak proffers that "Mr. Balthaser advised me that Quick Connect, as configured by EGS, does not fit the definition of a [p]redictive [d]ialer."  (Docket entry no. 72, Horak Rep. ¶ 53.)  Horak also learned from Balthaser that, at the end of each call, a customer service representative "record[s] the result of the call," and then "click[s] a hot button labelled Ready or Next, thereby instructing the system to dial the next set of numbers from the campaign database."  (Horak Rep. ¶ 53.)  Horak asserts

that "[t]his high level of human intervention is necessary to launch each and every call attempt for each and every [representative] logged in and available." (Id.) Horak also asserts that the Subject Number "was not randomly or sequentially created, but rather, was obtained from" Credit One. (Horak Rep. ¶ 5.)

For his part, Plaintiff submits the declaration Kevin Stark, former director of Product Management for LiveVox from mid-2012 through November 2017, who states that the LiveVox automated outbound dialing system "has predictive dialing capabilities and the ability to launch phone calls without direct human intervention on each phone call." (Docket entry no. 81-2, Stark Decl. ¶ 3.) Plaintiff also proffers the expert report of Randall Snyder, who opines that the LiveVox dialing system software "provides pacing algorithms for predictive dialing," and that the Quick Connect service, which is described in the LiveVox Manager User Guide as an "[a]utomated outbound service that immediately connects live answers with an available agent," is "precisely the definition of predictive dialing." (Docket entry no. 81-3, Snyder Rep. ¶ 26.) Snyder also opines that the LiveVox dialing system has the capacity to store and dial randomly or sequentially generated numbers because the algorithms to do so are "among the most basic in computer science" and EGS, if it "so chose, can easily upload random or sequentially generated telephone numbers."[4] (Snyder Rep. ¶¶ 31-35.)

---

[4] Horak disagrees with Snyder's conclusion that LiveVox can store and dial randomly or sequentially generated numbers, opining that "EGS did not write such a program" and that it would be "inaccurate to assert that one could or would write such a program and integrate it into the LiveVox platform without the consent of LiveVox." (Horak Rep. ¶¶ 66-67.) Neither Horak nor Snyder claims in his report to have inspected the LiveVox system at issue in this case.

DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that "might affect the outcome of the suit under the governing law," and there is a genuine dispute where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation marks omitted)). In evaluating a motion for summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

The Telephone Consumer Protection Act provides, in relevant part, that "[i]t shall be unlawful . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States." 47 U.S.C.S. § 227(b)(1)(A)(iii) (LexisNexis 2010). The TCPA permits any aggrieved plaintiff to recover a minimum of $500 per violation, and the court may treble that award if it finds that the defendant "willfully or knowingly violated" the statute. 47 U.S.C. § 227(b)(3).

An "automatic telephone dialing system" ("ATDS" or "autodialer") is defined by the TCPA as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47

U.S.C. § 227(a)(1). The FCC is authorized to promulgate regulations implementing the TCPA. 47 U.S.C. § 227(b)(2). In 2003, the FCC concluded that a "predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress." In re Rules & Regulations Implementing the Tel. Consumer Protection Act of 1991, 18 FCC Rcd. 14014, 14093 (2003) (the "2003 Order").[5] In reaching this conclusion, the FCC rejected an argument raised by industry members that predictive dialers do not fall within the statutory definition of ATDS because they do not dial numbers randomly or sequentially, but rather "store pre-programmed numbers or receive numbers from a computer database and then dial those numbers in a manner that maximizes efficiencies for call centers." Id. at 14090. The FCC observed that "[t]he principal feature of predictive dialing software is a timing function, not number storage or generation." Id. at 14091. Thus, the FCC continued, even though "the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective . . . [t]he basic function of such equipment, however, has not changed— the capacity to dial numbers without human intervention." Id. at 14092 (emphasis in original).

In 2008, the FCC issued a declaratory ruling affirming "that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers." In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 23 FCC Rcd. 559, 566 (2008) (the "2008 Ruling"). In the 2008 Ruling, the

---

[5] The 2003 Order defined a predictive dialer as "an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that 'predicts' the time when a consumer will answer the phone and a telemarketer will be available to take the call." Id. at 14022 n.31. The FCC noted that "[s]uch software programs are set up in order to minimize the amount of downtime for a telemarketer. In some instances, a consumer answers the phone only to hear 'dead air' because no telemarketer is free to take the call." Id.

FCC once again rejected the argument that "a predictive dialer meets the definition of autodialer only when it randomly or sequentially generates telephone numbers, not when it dials numbers from customer telephone lists." Id.  The FCC reiterated the same position in 2012, stating that the definition of ATDS "covers any equipment that has the specified capacity to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 27 FCC Rcd. 15391, 15392 n.5 (2012) (the "2012 Order") (emphasis in original).

In 2015, the FCC reaffirmed its previous statements that "dialing equipment generally has the capacity to store or produce, and dial random or sequential numbers (and thus meets the TCPA's definition of 'autodialer') even if it is not presently used for that purpose, including when the caller is calling a set list of consumers." In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 30 FCC Rcd. 7961, 7971-72 (2015) (the "2015 Order").  The FCC also determined that the "capacity" of calling equipment under the TCPA includes the equipment's "potential functionalities," and not just its "present ability." Id. at 7972-73.

On March 16, 2018, the United States Court of Appeals for the District of Columbia Circuit invalidated certain aspects of the 2015 Order in ACA International v. FCC, 885 F.3d 687 (D.C. Cir. 2018).  Among other things, the court "set aside the [FCC's] explanation of which devices qualify as an ATDS." Id. at 695.  The court noted that the statutory definition of an ATDS "naturally raises two questions: (i) when does a device have the 'capacity' to perform the two enumerated functions; and (ii) what precisely are those functions?" Id.  With respect to the first question, the court concluded that the FCC's interpretation of "capacity" in the

2015 Order to include a device's potential functions was unreasonably expansive. Id. at 700. The court then turned to the second question, observing that "[t]he impermissibility of the Commission's interpretation of the term 'capacity' in the autodialer definition is compounded by inadequacies in the agency's explanation of the requisite features." Id. at 701.

With respect to the second question, the court first determined that it had jurisdiction to review petitioners' challenge regarding the functions an ATDS "must be able to perform." Id. In this connection, the court rejected the FCC's argument that the 2015 Order was not reviewable because it only reaffirmed prior declaratory rulings concluding that the statutory definition of an ATDS includes predictive dialers. Id. The court stated that, "[w]hile the Commission's latest ruling purports to reaffirm the prior orders, that does not shield the agency's pertinent pronouncements from review." Id. Noting that the FCC's "prior rulings left significant uncertainty about the precise functions an autodialer must have the capacity to perform," and observing that petitioners "covered their bases" by filing petitions for both a declaratory ruling and for rulemaking concerning these issues, the court found that the FCC's decision to issue a declaratory ruling and deny the petitions for rulemaking rendered the 2015 Order "reviewable on both grounds." Id.

Turning to the substance of the FCC's "pertinent pronouncements," the court found, among other things, that the FCC was "of two minds" in its 2015 Order on the question of whether an ATDS must itself have the ability to generate random or sequential telephone numbers or whether a device can qualify as an ATDS even if it lacks that capacity and instead can only dial from an externally supplied list. Id. at 701-703. Although both interpretations "might be" permissible, the court concluded, the FCC's 2015 Order approach, which "espouse[d]

both competing interpretations in the same order," failed to satisfy the requirement of reasoned decisionmaking.  Id. at 703-704.

Since ACA International, district courts have been divided on the question of whether the D.C. Circuit's decision invalidating portions of the 2015 Order also invalidated related portions of prior FCC Orders discussing autodialer functions.  Compare, e.g., Pinkus v. Sirius XM Radio, Inc., 319 F. Supp. 3d 927, 935 (N.D. Ill. 2018) (holding that ACA International necessarily invalidated prior FCC orders to the extent that they find that all predictive dialers qualify as ATDSs); Thompson-Harbach v. USAA Fed. Sav. Bank, 2019 WL 148711, at *8-11 (N.D. Iowa Jan. 9, 2019) (same) with Reyes v. BCA Fin. Servs., Inc., 312 F. Supp. 3d 1308, 1320-21 (S.D. Fla. 2018) (holding that ACA International did not overrule prior FCC orders); Duran v. La Boom Disco, Inc., 2019 WL 959664, at *7-10 (E.D.N.Y. Feb. 25, 2019) (same).

Credit One urges the Court to follow Pinkus, Thompson-Harbach, and other similar decisions, arguing that ACA International also vacated the FCC's earlier decisions to the extent that those decisions concluded that a predictive dialer is always an ATDS, regardless of whether it randomly or sequentially generates telephone numbers or dials numbers from a list.  In the absence of FCC guidance, Credit One contends, the Court must look to the TCPA's statutory definition of an ATDS, which Credit One argues requires that a device have the capacity to "store or produce telephone numbers to be called, using a random or sequential number generator."  See 47 U.S.C. § 227(a)(1).  By contrast, Plaintiff argues that the impact of the D.C. Circuit's holding in ACA International is limited to the 2015 Order and the Court should therefore defer to the FCC's prior determinations in the 2003 Order, the 2008 Ruling, and the

2012 Order that a predictive dialer is an ATDS.[6]  Plaintiff submits that there is no genuine factual dispute as to whether LiveVox is a predictive dialer within the meaning of the FCC's earlier rulings, and that summary judgment thus should be awarded in its favor.

The Court has reviewed the relevant authorities and is not persuaded that ACA International invalidated the FCC's prior rulings on the definition of an ATDS.  Although the D.C. Circuit determined that the 2015 Order was inconsistent in certain respects with the FCC's prior rulings addressing predictive dialers, the court did not expressly reject those prior orders.  See Reyes, 312 F. Supp. 3d at 1321-22 ("What ACA International did was to reject the FCC's have-your-cake-and-eat-it-too approach to the questions before it . . . [b]ut what ACA International did not do is endorse one interpretation over the other, even implicitly.")  The Court respectfully disagrees with courts that have concluded that ACA International "necessarily invalidated" the FCC's prior orders because the D.C. Circuit's expressed concern regarding the FCC's failure to engage in reasoned decisionmaking in the 2015 Order "applies with equal force" to its prior orders.  See, e.g., Pinkus, 319 F. Supp. 3d at 935.  As other courts have noted, "the logic behind invalidating the 2015 Order does not apply to the prior FCC [o]rders," and the D.C. Circuit made no specific findings as to whether the FCC's prior orders similarly espoused two conflicting interpretations of the functions that an ATDS must have the capacity to perform. Duran, 2019 WL 959664, at *10.  Instead, the ACA International court concluded that the FCC's

---

[6] The parties do not dispute that this Court is bound by ACA International.  Under the Hobbs Act, the courts of appeals have exclusive jurisdiction to enjoin, set aside, suspend, or determine the validity of all final FCC orders that are reviewable under 47 U.S.C. § 402(a).  See 28 U.S.C. § 2342.  Where, as here, agency regulations are challenged in multiple courts of appeals, the petitions are consolidated and assigned to a single circuit court of appeals, which thereby becomes "the sole forum for addressing . . . the validity of the FCC's" order.  See King v. Time Warner Cable Inc., 894 F.3d 473, 476 n.3 (2d Cir. 2018) (quoting GTE S., Inc. v. Morrison, 199 F.3d 733, 743 (4th Cir. 1999)).

"most recent effort"—the 2015 Order—"falls short of reasoned decisionmaking." ACA International, 885 F.3d at 701.

Nor is it of any consequence that the D.C. Circuit found that it had jurisdiction to review the petitioners' challenge to the 2015 Order. While some courts have interpreted the D.C. Circuit's discussion of its jurisdiction to entertain the petitioners' challenge concerning the functions a device "must be able to perform" as expanding the scope of the court's ruling, these courts ignore the actual language of the D.C. Circuit's subsequent analysis of the issue, which does not ultimately implicate the validity of the FCC's prior orders. See Maes v. Charter Commc'n, 345 F. Supp. 3d 1064, 1068-69 (W.D. Wis. Oct. 30 2018) ("[The court of appeals'] analysis and holding were limited to the 2015 order: it looked at the ways in which the 2015 order expanded upon prior rulings, and then struck down those expansions as unreasonable. Although it discussed the content of the 2003 order, it did so only to highlight its contradictions with the new rules."). Even if the D.C. Circuit had jurisdiction to revisit the FCC's prior orders, it does not necessarily follow that the court actually exercised such jurisdiction to invalidate the orders. Because the Court finds that the FCC's prior rulings are undisturbed by ACA International, the Court defers to the FCC's prior determination that "a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers," even if it dials numbers from a list. (2008 Order ¶ 12.)

The Court next turns to the question of whether the LiveVox system at issue in this case is a predictive dialer within the meaning of the FCC's earlier rulings. Citing primarily to the declaration of Kevin Stark, former director of Product Management for LiveVox, who states that LiveVox "has predictive dialing capabilities and the ability to launch phone calls without direct human intervention," Plaintiff argues that LiveVox is a predictive dialer. (See

Stark Decl. ¶ 3.) The evidence proffered by Credit One to the contrary is insufficient to create a genuine issue of material fact as to whether the LiveVox system is a predictive dialer. Credit One cites principally to the testimony of EGS's Corporate Designee, Andrew Balthaser, who stated that Quick Connect does not "operate as a predictive dialer" because "to my knowledge, the algorithm is not changing. It's not adapting or predicting different things. It's operating within guardrails that are established at the creation of a campaign." (Balthaser Dep. 51:9-19.) However, when asked whether he knew if the LiveVox's "algorithm or system has any predictive capabilities," Balthaser responded that "only LiveVox has access to their algorithms to see how it paces or controls the number of calls launched," thus admitting that he did not have personal knowledge of LiveVox's predictive capabilities.[7] (See Balthaser Dep. 100:16-101:8.) It is undisputed here that the Quick Connect feature of the LiveVox dialing system uses a proprietary algorithm to determine how many calls to automatically place in order to keep customer service representatives fully occupied at all times and that Quick Connect adjusts the number of calls that are automatically placed based on the number of available customer service representatives at any given time. (Pl. 56.1 St. ¶ 18-20, 22-24, 26-27.) These facts are consistent with the FCC's definition of a predictive dialer as "an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that 'predicts' the time when a consumer will answer the phone and a telemarketer will be available to take the call." (2003 Order at n.31.) Accordingly, the competent undisputed evidence

---

[7] The expert report of Ray Horak is similarly insufficient to create a triable factual issue because Horak relies solely on information from Balthaser, opining that "Mr. Balthaser advised me that Quick Connect, as configured by EGS, does not fit the definition of a [p]redictive [d]ialer." (Horak Rep. ¶ 53.) Moreover, Horak does not claim to have inspected the LiveVox system at issue in this case.

establishes that LiveVox is an ATDS within the meaning of the TCPA, and Plaintiff is entitled to judgment as a matter of law on his claim for TCPA liability.

Reasonable Reliance

Defendants contend that, even if LiveVox is an ATDS within the meaning of the TCPA, Plaintiff's TCPA claim must still be dismissed because Credit One and EGS reasonably relied on the prior express consent of the individual who previously owned the Subject Number in placing the collection calls. Citing the FCC's unchallenged interpretation in the 2015 Order of the term "called party" to include "individuals who might not be the subscriber, but who, due to their relationship to the subscriber, are the number's customary user and can provide prior express consent for the call" (2015 Order at ¶ 75), Credit One argues that the Court should apply a similar "reasonable reliance approach" in creating a "common-sense exception to liability" for calls directed to new holders of reassigned cell phone numbers.

Credit One's argument finds no basis in the text of the TCPA, which only makes a caller's intent relevant in connection with the trebling of damages. See <u>Echevvaria v. Diversified Consultants, Inc.</u>, No. 13 Civ. 4980(LAK)(AJP), 2014 WL 929275, at *4 (S.D.N.Y. Feb. 28, 2014) ("The TCPA is essentially a strict liability statute that does not require any intent for liability except when awarding treble damages.") (internal quotation marks omitted).[8] Nor is the FCC's "reasonable reliance approach" in the customary user context sufficiently analogous to the reassigned number context to support the kind of expansive exception to liability Credit One

---

[8] Indeed, courts that have interpreted the text of the TCPA have rejected an interpretation of the phrase "called party" that refers to the intended recipient of a call, as opposed to the current subscriber of the number called. See, e.g., <u>Soppet v. Enhanced Recovery Co.</u>, 679 F.3d 637, 641-42 (7th Cir. 2012).

advocates for here.  The customary user whose consent provides a basis for reliance under the FCC's 2015 Order interpretation is by definition someone who is a current, ongoing user of the relevant cell phone number.  The reassignment of a number creates no relationship between the prior, consenting holder and the new holder.  Thus, there is no reasonable basis for reliance on the original holder's consent as indicative of consent by the new user.  Indeed, in a portion of the 2015 Order that the ACA International court later rejected, the FCC observed that there was "no basis in the statute or the record before us to conclude that callers can reasonably rely on prior express consent beyond one call to reassigned numbers" (2015 Order ¶ 90 n.312), and framed a very limited "reasonable reliance approach" by providing only a one-call safe harbor for reassigned numbers.  Accordingly, the Court declines Defendants' invitation to recognize a reasonable reliance exception or defense that is inconsistent with the plain language of the statute.[9]

Motion to Stay

Credit One also argues that a stay pending the FCC's forthcoming rulemaking on reassigned number liability is warranted pursuant to either the primary jurisdiction doctrine or the Court's inherent authority.  On March 23, 2018, the FCC issued a notice of proposed rulemaking seeking comment on "ways to address the problem of unwanted calls to reassigned numbers," including "the specific information that callers need from a reassigned numbers database" and "the best way to make that information available to callers that want it."  In the

---

9   The Court respectfully disagrees with the conclusions reached in Danehy v. Time Warner Cable Enters., 2015 WL 5534094, at *6–7 (E.D.N.C. Aug. 6, 2015) and Chyba v. First Financial Asset Mgmt., 2014 WL 1744136, at *12 (S.D. Cal. Apr. 30, 2014), each of which held that a defendant's good faith belief that it had consent to call the plaintiff operated as a complete defense to TCPA liability.

Matter of Advanced Methods to Target and Eliminate Unlawful Robocalls, 2018 WL 1452721 ¶¶ 1-2 (Mar. 23, 2018). On May 14, 2018, the FCC issued a public notice seeking comment on "how to treat calls to reassigned wireless numbers under the TCPA" in light of the court's decision in ACA International, including how to interpret the term "called party" for calls to reassigned numbers, whether the FCC should maintain a reasonable reliance approach to prior express consent, and whether a reassigned numbers safe harbor is necessary. (Docket entry no. 76-6, Frampton Decl. Ex. F at 3-4.)

The doctrine of primary jurisdiction ensures that "courts and agencies with concurrent jurisdiction over a matter do not work at cross-purposes." Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp., 84 F.3d 91, 97 (2d Cir. 1996). A court may stay a case in deference to an agency if it determines that a stay is necessary to "maintain[ ] uniformity in the regulation of an area entrusted to a federal agency" or to "utiliz[e] administrative expertise" on technical questions. See Ellis v. Tribune Television Co., 443 F.3d 71, 82 (2d Cir. 2006). To determine whether deference is appropriate, the court considers "(1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made." Id. at 82-83.

The Court may also stay a case pursuant to its inherent authority. In determining whether to exercise its discretion to enter a stay, a court should consider: "(1) the private interests of the plaintiffs in proceeding expeditiously with the civil ligation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants;

(3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest."  Reynolds v. Time Warner Cable, Inc., 2017 WL 362025, at *2 (W.D.N.Y. Jan. 25, 2017).

        Credit One argues that a stay is warranted because reassigned number liability involves balancing the privacy rights of the individual and the commercial speech rights of the telemarketer, matters that are within the FCC's field of expertise, and that proceeding with this action would create the risk of inconsistent rulings because district courts are required to adhere to the FCC's interpretation of the TCPA.  Credit One further argues that Plaintiff will not be prejudiced by a stay since discovery has concluded, and that any stay will be relatively brief, as evidenced by the fact that the FCC sought comment on the topic of reassigned number liability only six days after the mandate was issued in ACA International.  For his part, Plaintiff argues that the FCC's proposed rulemaking regarding a reassigned numbers database will have no bearing on this case, particularly where multiple courts have already provided guidance on the meaning of the term "called party."  See, e.g., Soppet, 679 F.3d at 641 (7th Cir. 2012); Osorio v. State Farm Bank, F.S.B., 746 F.3d 1242, 1250-52 (11th Cir. 2014).  Plaintiff also argues that, even if the FCC were to make rulings favorable to Credit One, such rulings would not apply retroactively.

        The Court agrees with Plaintiff that a stay is not warranted in this matter under either the primary jurisdiction doctrine or the Court's inherent authority.  The FCC's March 23, 2018, notice of proposed rulemaking appears to pertain only to the creation of a reassigned numbers database and does not speak directly to issues of reasonable reliance or reassigned number liability under the TCPA.  Although the FCC, in the wake of ACA International, sought further comment on a safe harbor for reassigned numbers and the interpretation of the term

"called party" for calls to reassigned numbers, the May 14, 2018, public notice cited by Credit One does not indicate any intent by the FCC to proceed with rulemaking on those topics in the near future. Moreover, as Plaintiff points out, courts can interpret the TCPA in the absence of agency guidance and have already done so. See Pieterson v. Wells Fargo Bank, N.A., 2018 WL 3241069, at *3 (N.D. Cal. July 2, 2018) (denying similar request for a stay in part because "interpreting the term 'called party' does not necessarily require any particular expertise that the FCC might offer.").

Thus, there is no present danger of inconsistent rulings, nor is the FCC's particular technical or policy expertise implicated by Credit One's reasonable reliance argument. Furthermore, staying this action would unnecessarily delay resolution of Plaintiff's claims, and the mere possibility of a more favorable determination by the FCC at some uncertain point in the future is insufficient to demonstrate that Credit One will be prejudiced if this action proceed. Pieterson, 2018 WL 3241069, at *5 (noting that the FCC's process "can take years," and often results in a "cycle of staying a case while an FCC order is pending only to have the FCC order challenged in court . . . demonstrating the real possibility of indefinite delay.") Accordingly, the Court denies Credit One's motion to stay this action pending further rulemaking by the FCC on the issue of reassigned number liability.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted as to the issue of TCPA liability, and Credit One's motions for summary judgment and a stay are denied. The final pre-trial conference in this case is currently scheduled for **June 21, 2019, at 11:00 a.m.** The parties are directed to contact Magistrate Judge Cott's chambers promptly to schedule a settlement conference. If no settlement is concluded by **May 15, 2019**, the parties

must meet and confer regarding damages and file a joint status report by **May 22, 2019**, identifying all uncontested material facts relevant to the determination of damages, any contested factual issues, the parties' respective positions on those contested factual issues, and stating whether a trial is necessary. This Memorandum Opinion and Order resolves docket entry nos. 49, 53, 57, 66, 68, 74, 83, and 85.

    SO ORDERED.

Dated: New York, New York
March 28, 2019

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge